# United States District Court

## DISTRICT OF DELAWARE

UNITED STATES OF AMERICA

v.

JENELLE RUIZ-MARTINEZ and
ANA RAMOS

REDACTED

Criminal Complaint
Case No. 05 – 77M

CR 05-41-1-2

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about __April 16, 2005__ in __New Castle__ County, in the District of Delaware, and elsewhere, defendants did knowingly conspire to distribute heroin, a controlled substance,

in violation of Title ____21____ United States Code, Section(s) _846 and 841(a)(1) and (b)(1)(C)_.

I further state that I am a(n) __Special Agent, DEA__ and that this complaint is based
on the following facts:

See attached Affidavit

Continued on the attached sheet and made a part hereof:   Yes

_____
Signature of Complainant
Mark T. McHugh
Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

__April 18, 2005__                                    at   Wilmington, DE
Date                                                           City and State

Honorable Mary Pat Thynge
United States Magistrate Judge                         _____
Name & Title of Judicial Officer                       Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Your affiant, MARK T. MCHUGH, do depose and state as follows:

1. I am a Special Agent (S/A) with the Drug Enforcement Administration (DEA), United States Department of Justice, and have been so employed since September 1995. During the course of my law enforcement career, I have participated in several hundred criminal investigations in both the undercover and surface capacity involving violations of state and federal narcotics laws, which led to arrests, convictions of violators, and seizures of narcotics and proceeds gained from illegal activity. I have interviewed numerous drug dealers and I am trained in the use of confidential informants in investigations of other drug dealers. In my experience as a Wilmington field agent, I have become familiar with the heroin trade from Philadelphia to Wilmington and in Wilmington.

2. The information contained in this affidavit is based on both my personal knowledge as well as information provided to me by other law enforcement officers who participated in this investigation. This affidavit is submitted in support of a criminal complaint against Jenelle RUIZ-MARTINEZ, ▇▇▇▇ and Ana RAMOS, ▇▇▇▇ for conspiracy to distribute heroin, in violation of Title 21, United States Code, Section 846 and 841(a)(1) and (b)(1)(C). Not all facts known to me are stated in this affidavit, which is made solely for the purpose of establishing probable cause.

3. On April 15, 2005, detectives assigned to the Wilmington Police Department ("WPD") Drug, Organized Crime and Vice Squad arrested [MTM 4/18/05] a cooperating individual (hereafter the CI) shortly after departing a suspected heroin "stash house". The CI was arrested after a brief vehicle pursuit which terminated when he exited his vehicle at the 12th Street Bridge in Wilmington, ripped open a package containing "bundles" of heroin and threw it into the river below. WPD

detectives searched the river and recovered approximately 441 clear plastic heat-sealed bags each containing a white chalky powder sealed in blue wax paper stamped "VERSACE". A sample of white powder from one of the heat-sealed bags field-tested positive for heroin. Agents assigned to the Drug Enforcement Administration (DEA) obtained a federal search warrant for the "stash house" used by the CI which resulted in the seizure of approximately 1,264 additional clear plastic heat-sealed bags containing white chalky powder sealed in blue wax paper stamped "VERSACE". A sample of white powder from one of those bags also field-tested positive for heroin.

4.  Following his arrest, the CI was advised of his rights and waived them. He identified his heroin source of supply as a Hispanic female in Philadelphia known as "BABY". The CI stated that he obtains 100 to 200 "bundles" of heroin, approximately 1300 to 2600 bags, from "BABY" during each meeting, which he distributes in Delaware. The CI stated that he has been dealing with "BABY" for approximately 4 to 5 months and that he meets her approximately twice a week. The CI stated that he places his heroin order via cell phone and that it usually takes her and/or her associates an hour and a half to two hours to prepare the order. The CI also advised that they arrange their meetings via cell phone and that it was not unusual for "BABY" to call him. The CI advised that he met "BABY" at pre-arranged locations in Philadelphia to take delivery of the heroin and also described vehicles used by "BABY". The CI stated that sometimes "BABY" was accompanied by other unknown Hispanic persons, male and female, when she made deliveries. The CI advised that he met "BABY" two days earlier at a 7-11 store on Cottman Avenue in Philadelphia and that the heroin seized pursuant to the arrest and the search warrant was heroin "BABY" delivered to him at that time. The CI further advised that he owes "BABY" $1000 dollars. The CI provided the cell phone number for "BABY" and agreed to

call her to arrange a heroin delivery.

5.  Thereafter, on April 15, 2005, The CI made a series of consensually recorded calls to "BABY" under the direction and control of law enforcement officers (LEOs). At approximately 6:03pm, the CI called "BABY" from his cell phone. The CI hung up without leaving a message after receiving her voicemail. At approximately 6:04pm, the CI attempted another call to "BABY", during which a simultaneous incoming call was heard beeping in. The CI attempted to take the incoming call but was disconnected. Seconds thereafter, he received an incoming call from "BABY". The CI told "BABY" that he had the $1000 dollars that he owed and that he needed "200" (referring to 200 bundles of heroin). "BABY" said she would call the CI when she was ready. At approximately 8:15pm, the CI placed another call to "BABY" and asked if she was ready for him. "BABY" apologized and stated she would be ready for the CI in the morning.

6.  On April 16, 2005, at approximately 10:12am, under the direction and control of LEOs, the CI placed a call to "BABY". The CI asked if she was ready for him and advised her that he had called her earlier. "BABY" asked how much he needed and the CI stated "200". "BABY" inquired how much he was bringing, and the CI stated that he had $11,000 dollars altogether. "BABY" asked if the CI was sure, and he stated that he was. Thereafter, "BABY" told the CI to hold on and she put an unidentified male, "PAPI", on the phone. The CI asked "PAPI" what was going on and "PAPI" explained that they had a little problem last night with the "candy" and that when they checked it out the "candy" was no good. "PAPI" explained that they had to change the "candy" because he did not want to give the CI "candy" that was no good. "PAPI" stated that he was doing the new "candy" now. The CI asked how long he would have to wait. "PAPI" said he was working on the new "candy" now and that he would call the CI back

when they were finished.

7.	At approximately 3:36pm, under the direction and control of LEOs, the CI placed another call to "BABY". The CI asked if she was ready yet. "BABY" said she would check it out and call the CI back. At approximately 3:50pm, the CI placed another call to "BABY", and she said that she would call the CI right back. At approximately 3:58pm, the CI received an incoming call from 'BABY" that was not answered. The CI immediately called "BABY" back and asked if she called him. "BABY" asked how much the CI needed again and the CI told her "200". "BABY" said she would be ready at 6:00pm. Thereafter, LEOs transported the CI to the vicinity of the 7-11 Store on the corner of Cottman and Brous Avenues in Philadelphia.

8.	At approximately 6:20pm, under the direction and control of LEOs, the CI placed a call to "BABY". He advised her that he was getting off the exit and would be there in 10 minutes. At approximately 6:35pm, the CI placed another call to "BABY" and advised her that he was at the 7-11 store. At approximately 7:00pm, the CI placed another call to "BABY" wherein she advised the CI to meet her at the mall. The CI stated that he did not like the mall and "BABY" then told him to meet her at the K-Mart. At approximately 7:15pm, the CI placed another call to "BABY" which was not answered. At approximately 7:16pm, the CI placed another call to "BABY" and told her that he was not going to K-Mart because police were there. "BABY" indicated that she saw the police at K-Mart and asked where the CI was now. The CI stated that he was at the 7-11 store. Shortly thereafter, LEOs observed two Hispanic females in a burgundy mini-van matching the vehicle description provided by the CI on Brous Avenue at the stop light next to the 7-11 store. The van turned eastbound onto Cottman Avenue and pulled over just past the entrance to the 7-11 parking lot. The CI was able to see the van and advised LEOs

that the driver, who appeared to be on a cell phone, was "BABY". The van pulled away as LEOs moved in to effect a traffic stop.

9. At approximately 7:20pm, a traffic stop was conducted on the van in the 7200 block of Barnard Avenue near the corner of Cottman Avenue. The females were removed from the vehicle and a multi-colored gift bag was located behind the front seats. The bag contained eight clear plastic baggies which further contained approximately 2,498 small clear heat-sealed plastic bags, each containing a white chalky powder sealed in blue wax paper stamped "VERSACE". A sample of white powder from one of those bags field-tested positive for heroin. Based upon my training and experience, I believe the sum of all the white chalky powder contained in all the small heat-sealed bags weighs approximately 45 net grams of a substance containing heroin. The quantity and packaging of the heroin seized from RUIZ-MARTINEZ and RAMOS is consistent with distribution purposes, not personal use.

10. The females were arrested by detectives assigned to the Philadelphia Police Narcotics unit. The driver of the van identified herself as Jenelle RUIZ-MARTINEZ (DOB: 4/30/79) and the passenger identified herself as Ana RAMOS (DOB: 2/02/82). Following the arrest, the CI positively identified RUIZ-MARTINEZ as "BABY". The CI further stated that RAMOS has accompanied RUIZ-MARTINEZ on 3 to 4 other occasions when RUIZ-MARTINEZ made prior heroin deliveries to the CI and that RAMOS has personally handed the package containing heroin to him on some of those occasions. The CI also stated that RAMOS was present during the last meeting he had with RUIZ-MARTINEZ at the 7-11 store.

WHEREFORE, based on the above-stated facts, your affiant believes that there is probable cause to believe that Jenelle RUIZ-MARTINEZ and Ana RAMOS did knowingly conspire to distribute mixtures and substances containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, 841(a)(1) and (b)(1)(C), all in violation of Title 21 United States Code, Section 846, and prays that a criminal complaint be issued.

I, the undersigned, swear that the above-stated facts are true to the best of my knowledge, information, and belief.

_____
Special Agent Mark T. McHugh
U.S. Drug Enforcement Administration

Sworn to before me and subscribed
in my presence, this __ day of ____, 2005.

_____
THE HONORABLE MARY PAT THYNGE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF DELAWARE